## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

**UNITED STATES OF AMERICA**

    **v.**

**ANTHONY JONES**

**Criminal No. 2:19-cr-00201-JDL**

### GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS EVIDENCE

The United States of America, by and through its attorneys, Halsey B. Frank, United States Attorney for the District of Maine, and Meghan E. Connelly, Assistant United States Attorney, respectfully objects to defendant Anthony Jones's ("Jones") Motion to Suppress. The defendant has been charged by indictment with one count of possession with intent to distribute cocaine and heroin, in violation of 21 U.S.C. § 841(a)(1) (ECF No. 16).

Jones seeks to suppress evidence obtained from the traffic stop of his vehicle by Maine State Police on September 30, 2019. The officer had reasonable suspicion that Jones had committed a traffic infraction when he instituted the stop. Additionally, responding officers did not unreasonably prolong the traffic stop because reasonable suspicion of other criminal wrongdoing arose during the course of the traffic stop. This permitted further inquiry, and, consequently, a longer stop. Accordingly, the Defendant's motion should be denied.

### Factual Background[1]

On September 30, 2019, Trooper John Darcy of the Maine State Police was traveling northbound while patrolling a stretch of highway along the Maine Turnpike in York. At approximately 6:10 P.M., Officer Darcy noticed a Jeep Grand Cherokee traveling northbound in

---

[1] Unless otherwise indicated, all facts are drawn from the dash camera video from Trooper Darcy's cruiser.

the far right lane with an expired inspection sticker. Trooper Darcy initiated a traffic stop and the vehicle pulled over into the breakdown lane without incident.

The vehicle had two occupants: Jones, who was the driver, and a female passenger who was seated in the front passenger seat. Trooper Darcy approached the vehicle on the passenger side, informed Jones that the inspection sticker was expired, and asked to see both occupants' drivers' licenses. In response, Jones stated that the vehicle belonged to his friend. Then, both Jones and the passenger produced valid Maine driver's licenses. At this point, Trooper Darcy asked Mr. Jones, "Would you mind stepping out of the vehicle?" Jones agreed and exited the Jeep.

After exiting the vehicle, Jones consented to a pat down for weapons.  Because Jones was driving a vehicle that did not belong to either occupant, Trooper Darcy attempted to dispel any suspicion that the vehicle may have been stolen. As a result, he asked Jones routine questions related to whose vehicle he was driving, Jones' driving history, as well as the general trip itinerary. Jones responded that he was coming from New York but had stopped in Massachusetts earlier that day. Trooper Darcy followed-up by asking where in Massachusetts they had stopped. After a prolonged, noticeable pause, Jones stated "like Fitchburg."

Trooper Darcy then went to ask the passenger virtually the same questions he posed to Jones. Unlike Jones, however, the passenger indicated that they did not make any stops on their return from New York other than for gas. Following inconsistent responses from the two occupants of the vehicle, Trooper Darcy's suspicion that criminal wrongdoing was afoot began to grow.

According to his report, Trooper Darcy returned to his cruiser to check the two individuals' information in the BMV database. (Rep. ¶ 9). Trooper Darcy continued to speak

with Jones – who was now standing at the passenger window of the cruiser – about the details of the stop in Massachusetts. Jones again told Trooper Darcy that the two occupants had stopped to see a friend of Jones' in Fitchburg on their way back to Maine from New York. Trooper Darcy explained that Fitchburg was "way out of the way." Once more, Jones paused for a significant period of time before attempting to explain that the stop was in another town in Massachusetts. Jones explained that he was on the phone with his friend who he had not seen in years who happened to be in an unknown town that Jones was passing through. According to Jones, the two then agreed to meet at a gas station that was off the road he was traveling on but also, somehow, close to this friend.

During the course of the conversation with Jones, Trooper Darcy completed the records check for Jones and the passenger through the BMV database. Trooper Darcy learned that the passenger had two prior felony convictions: one for the Unlawful Possession of Scheduled Drugs, and another for the Unlawful Trafficking of Scheduled Drugs. Based on a number of factors, including the inconsistent responses from the two passengers about the itinerary, the passenger's criminal history related to narcotics, and the unlikely story advanced by Jones about meeting a friend, Trooper Darcy believed that criminal wrongdoing was actively taking place. As a result, he radioed for a K-9 unit to come to the scene.

The information that Trooper Darcy gleaned during the course of addressing the inspection sticker issue naturally shifted his attention to the criminal wrongdoing that he believed was taking place. Accordingly, Trooper Darcy's line of inquiry shifted away from the inspection sticker to questions related to the potential criminal activity. To further investigate his suspicions, Trooper Darcy continued to engage in conversation with Jones – who actively participated in the banter – about the supposed meeting with a friend in an unknown

Massachusetts town. Jones told Trooper Darcy that his friend was a black male named "Stacy," whose last name Jones did not know. Additionally, Jones changed his story about how he was communicating with "Stacy." Initially, Jones said he was speaking with "Stacy" on the phone. Then, in response to Trooper Darcy's question about the call appearing in Jones's call log, Jones stated that the call was actually taking place over Instagram's video chat feature. Moreover, Jones maintained that although the passenger in his vehicle did not know his friend "Stacy," she nevertheless observed the two meetup at a gas station.

Following this exchange with Jones, Trooper Darcy exited his cruiser and returned to the passenger side of the Jeep to speak with the passenger about her drug trafficking history and the alleged meetup. The passenger was adamant that Jones did not meet an individual at a gas station in Massachusetts. In light of the glaring inconsistencies between the two individuals' stories, Trooper Darcy ordered the passenger out of the vehicle. Shortly thereafter, two other officers with the Maine State Police arrived at the scene. The officers began to search around the outside of the vehicle, including the wheel wells, until the K-9 unit arrived.

The K-9 Unit was in Lebanon, Maine at the time that Trooper Darcy called requesting assistance. (Rep. ¶ 12). Approximately 30 minutes after Trooper Darcy's call, the K-9 Unit arrived at the scene. (Rep. ¶ 18). Once on the scene, the K-9 was led around the vehicle and alerted to the odor of narcotics in the vehicle. After the K-9 alerted, Trooper Darcy and another officer at the scene searched the vehicle and found two cardboard boxes filled with approximately fifteen hundred bundles[2] of heroin/fentanyl. At this point, Jones and the passenger were officially placed under arrest. Jones also admitted that he had drugs that were hidden in his

---

[2] According to Trooper Darcy's report, "[b]undles of heroin are 10 bags of typically .10 grams or sometimes .25 and .05 grams of heroin/fentanyl wrapped together but [sic] a rubber band, prepacked for sale." (Rep. ¶ 23).

underwear. At the officers' direction, and under their supervision, Jones manipulated the drugs

out of his pants and approximately seventeen grams of cocaine was recovered by Trooper Darcy.

## Argument

It is well-established that a dog-sniff conducted during a routine traffic stop is not a

violation of the Fourth Amendment as long as the stop is not "prolonged beyond the time

reasonably required to complete the mission of issuing a warning ticket." *Rodriguez v. United

States*, 135 S.Ct. 1609, 1615 (2015) (internal quotation marks omitted); *see also United States v.

Caballes*, 543 U.S. 405, 407 (2005). Furthermore, because a "[a] routine traffic stop is more akin

to a *Terry* stop than an arrest," *United States v. Dion*, 859 F.3d 114, 123 (1st Cir. 2017), the

Supreme Court has noted that the "tolerable duration of police inquiries in the traffic-stop

context is determined by the seizure's 'mission' – to address the traffic violation that warranted

the stop, and attend to related safety concerns." *Rodriguez*, 135 S.Ct. at 1614 (internal citation

omitted). Additionally, officers are permitted to conduct "ordinary inquiries incident to [the

traffic] stop." *Dion*, 859 F.3d at124 (quoting *Rodriguez*, 135 S.Ct. at 1615) (alterations in

original). These inquiries may include "checking the driver's license, determining whether there

are outstanding warrants against the driver, and inspecting the automobile's registration and

proof of insurance, as well as conducting criminal record searches to ensure officer safety." *Id.*

Officers are also permitted to inquire about a driver's itinerary. *Id.* at 125 (citing *United States v.

Fernandez,* 600 F.3d 56, 60-62 (1st Cir. 2010)). Critically, however, these limitations only apply

when officers lack reasonable suspicion of other criminal wrongdoing. *Rodriguez*, 135 S.Ct. at

1615. As a result, when reasonable suspicion of other criminal wrongdoing emerges, officers are

necessarily permitted to expand the scope of their inquiries beyond those related to the original

stop in order to address the potential criminal activity. *Dion*, 859 F.3d at 124 (citing *United States v. Ruidiaz*, 529 F.3d 25, 28-29 (1st Cir. 2008)).

I.   **Trooper Darcy Had Reasonable Suspicion of Other Criminal Wrongdoing and was Therefore Permitted to Expand the Scope of his Investigation beyond the Expired Inspection Sticker.**

Given how rapidly traffic stops can evolve, "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." *Id.* at 125 (quoting *Terry v. Ohio,* 392 U.S. 1, 10 (1968)). The First Circuit has concluded that "[i]nvestigatory stops have two components." *Dion*, 859 F.3d at 124. First, "a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop." *Id.* Although courts at all levels have struggled to precisely define reasonable suspicion, "it is well established that . . . reasonable suspicion requires more than a mere hunch but less than probable cause." *Ruidiaz*, 529 F.3d at 29. Therefore, "no *direct* link between the suspect and the suspected criminal activity need be forged in order to achieve reasonable suspicion." *Id.* (emphasis in original). Second, "any action undertaken with respect to the stop must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation." *Id.* Thus, when an officer "undertakes an investigation pursuant to a *Terry* stop, his ensuing actions must be fairly responsive to the emerging tableau." *Dion*, 859 F.3d at 124.

First, it is undisputed that the first prong of the analysis is met. The inspection sticker was expired and this provided Trooper Darcy with the reasonable suspicion necessary to initiate the traffic stop. Second, following a lawful stop for a traffic violation, a driver's responses to questions about his itinerary that do not "add up," along with other factors, may give rise to reasonable suspicion of other criminal wrongdoing and permit further investigation. *Id.* For

example, in *Dion*, the defendant challenged the length of the stop and, like Jones, argued that the stop was unreasonably prolonged because questioning continued following the issuance of a speeding ticket – which was the original justification of the stop. *Id.* However, the First Circuit was unpersuaded. In particular, the Court found that reasonable suspicion of other criminal wrongdoing existed which justified the prolonged stop. *Id.* at 128.

The *Dion* court dealt with factually similar circumstances to those presented in the instant case. Because the determination of reasonable suspicion is a fact-driven inquiry, the facts of *Dion* require some recitation. In *Dion*, a police officer in Junction City, Kansas pulled Dion over for speeding. *Id.* at 118. As part of his routine questioning related to the stop, the officer asked Dion about his trip itinerary. *Id.* Dion stated that he was traveling from Yardley, Pennsylvania back to his home in Tucson, Arizona. *Id.* When asked the purpose of his trip, Dion answered that he had made the drive to meet with his certified public accountant. *Id.* Immediately after this response from Dion, the officer's suspicion was piqued. *Id.* at 125. In fact, the First Circuit noted that "[a] drive of that distance for that purpose was reasonably viewed as odd, to say the least, and that odd answer to a concededly appropriate question about travel itinerary both prompted and warranted [the officer's] follow-up questions in the cruiser on that subject." *Id.* at 126. Additionally, the officer conducted a Google search of Yardley, Pennsylvania and determined that the route Dion was taking was "off." *Id.* Based on these facts, the officer continued to discuss the trip with Dion and eventually discovered that Dion had a prior conviction for trafficking narcotics. *Id.* at 127. With this factual background, the First Circuit concluded that the "emerging tableau" provided the officer with reasonable suspicion to extend the stop and continue to the investigation, which ultimately led to a large quantity of marijuana in Massachusetts. *Id.*

Trooper Darcy's continued questioning of Jones in this case was prompted by Jones' suspicious answers to routine questions and was therefore "responsive to the emerging tableau." As the facts unfolded for Trooper Darcy, his suspicions that other criminal wrongdoing was afoot began to rise. First, Jones was not driving a vehicle belonging to himself or his passenger. Next, when Trooper Darcy posed a routine question regarding Jones' trip itinerary – as the officer in *Dion* did – Jones gave an answer that, according to Trooper Darcy, did not "make sense." It was only in response to this answer by Jones that Trooper Darcy continued to inquire about Jones' itinerary. With each additional question, Jones' story became more convoluted. For example, when Trooper Darcy pointed out to Jones that Fitchburg was "way out of the way," Jones paused for a substantial period of time before changing his story. Jones went on to say that it was another town but he could not remember the name of it but that it may have been Framingham. Furthermore, the passenger in the vehicle had a history of drug trafficking and gave answers that flatly contradicted those that Jones gave to nearly identical questions. Although each fact on its own may not have provided the necessary level of suspicion, taken as a whole, the facts unfolded during the course of the traffic stop in a way that provided Trooper Darcy with reasonable suspicion to extend the stop beyond what was necessary to deal with the expired inspection sticker.

Jones' contention that the approximately hour long stop was only supported by the expired inspection sticker is not supported by the facts of the stop. Consequently, *Rodriguez* provides no relief. Unlike *Rodriguez*, where the traffic stop was prolonged in the absence of reasonable suspicion in order for the officer to walk the K-9 around the vehicle, the K-9 unit was called by Trooper Darcy *as a result of* the reasonable suspicion of other criminal wrongdoing.

In sum, Trooper Darcy's inquiries regarding Jones' trip itinerary began as part of the Trooper's routine questioning related to the traffic stop. It was only after Jones responded in a suspicious manner to straightforward questions that Trooper Darcy began to expand his inquiries. His investigation was therefore responsive to the unfolding situation and ultimately provided the Trooper with reasonable suspicion that criminal wrongdoing was afoot and he pursued his investigation accordingly.

II.     **Trooper Darcy Diligently Pursued His Investigation of the Criminal Wrongdoing and the Stop Was No Longer Than Reasonably Necessary to Investigate the Illegal Activity.**

Although there is no rigid time requirement for a *Terry* stop, stops may not be extended "beyond the point reasonably needed to investigate the possible illegal activity." *United States v. Ramdihall*, 859 F.3d 80, 88 (1st Cir. 2017). Given this loose framework, stops spanning a wide range of times have been held to be constitutional. *See, e.g., Id.* (holding that an investigative stop lasting 82 minutes was permissible); *United States v. McCarthy*, 77 F.3d 522, 531 (1st Cir. 1996) (concluding that a 75 minute stop was reasonable because "[t]here [was] no evidence . . . of less than diligent behavior on the part of the police.")

In *Ramdihall*, the First Circuit addressed the constitutionality of two stops. First, the Court reviewed an eighty-two minute affair in the parking lot of a 7-Eleven. That stop was extended because responding officers needed to wait for detectives with experience in investigating credit card fraud to arrive at the scene. *Id.* at 85-88. The First Circuit was clear that although the eighty-two minute stop was "lengthy," it was not "longer than reasonably needed to investigate the possible illegal activity." *Id.* at 88. Second, *Ramdihall* dealt with a separate stop that involved a dog sniff, supported by reasonable suspicion, which occurred six minutes after the issuance of the traffic ticket. *Id.* at 90-92. Again, the Court was unpersuaded by Ramdihall's

argument that the stop was prolonged. The Court upheld the dog sniff as reasonable on the ground that officers diligently pursued their investigation of the criminal wrongdoing that they had reasonable suspicion to believe was at hand. *Id.* at 91. In other words, once the officers had reasonable suspicion to believe that Ramdihall and his passenger were engaged in narcotics trafficking, it was reasonable to continue the stop until the dog sniff could be conducted.

Throughout the course of the traffic stop, Trooper Darcy continued to diligently pursue his investigation into the criminal wrongdoing that he reasonably suspected was occurring. Once Trooper Darcy had reasonable suspicion that criminal activity was taking place, he radioed for a K-9 unit to respond. The unit responded as promptly as possible to the scene. Furthermore, Trooper Darcy and the other responding officers continued to investigate the criminal wrongdoing during the time that the K-9 unit was en route. Given that Trooper Darcy reasonably believed that Jones was involved in narcotics trafficking, Trooper Darcy required the presence of a K-9 unit to pursue the investigation. Trooper Darcy did not delay calling the K-9 unit, nor is there evidence that the unit was delayed in responding to the scene. In short, there is no indication that the length of the stop was the result of any "less than diligent behavior on the part of the police." *McCarthy*, 77 F.3d at 531. Consequently, the stop was not prolonged beyond the point reasonably necessary to investigate the potential criminal activity.

Trooper Darcy and the other responding officers conducted their investigation into the suspected criminal wrongdoing by Jones in as expeditiously as Maine's geography allowed. Once Trooper Darcy had reasonable suspicion that criminal wrongdoing was afoot, he diligently pursued his investigation into that particular wrongdoing. Accordingly, the length of the stop was not unreasonable and the Defendant's motion must be denied.

## **Conclusion**

For the aforementioned reasons, the Government respectfully requests this Court deny the

Defendant's Motion to Suppress Evidence.


Dated: December 3, 2019

> Halsey B. Frank
> United States Attorney
>
>
>  /s/ Meghan E. Connelly
> Meghan E. Connelly
> Assistant United States Attorney
> U.S. Attorney's Office
> 100 Middle Street Plaza, East Tower
> Portland, ME  04101
> meghan.connelly@usdoj.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 3, 2019, I electronically filed the Government's Opposition to the Defendant's Motion to Suppress with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the attorney of record, Peter Rodway.

Halsey B. Frank
United States Attorney


<u>/s/ Meghan E. Connelly</u>
Meghan E. Connelly
Assistant United States Attorney
U.S. Attorney's Office
100 Middle Street Plaza, East Tower
Portland, ME  04101
meghan.connelly@usdoj.gov